UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 16-CR-127 (SRU) |
| vs. | : | |
| ANTRUM COSTON | : | APRIL 9, 2020 |

**DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE**

      Antrum Coston, the Defendant, through undersigned counsel, respectfully submits this emergency motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  Mr. Coston is presently in Bureau of Prisons' (BOP) custody at FCI Danbury where at least 28 inmates, and 12 staff members, have been diagnosed with the COVID-19 virus.  In light of the COVID-19 pandemic, there are extraordinary and compelling reasons to reduce Mr. Coston's sentence so that he leaves BOP custody immediately.

      First, and foremost, Mr. Coston suffers from chronic asthma and is at a heightened risk of severe complications from the COVID-19 virus.  He uses an Albuterol Sulfate, Breo and Bariva inhalers daily.  He has been considered a high risk of developing Chronic Obstructive Pulmonary Disease (COPD), and suffered from pneumonia.  The CDC has recently concluded that individuals with underlying health conditions, such as asthma are hospitalized at approximately three times the rate as individuals without such conditions.  *See* Exhibit A.  Second, Mr. Coston is due to move to a halfway house on May 21, 2020, and, on July 21, 2020, will be eligible for home detention.  Ending the incarceratory portion of his sentence now, during the pandemic, will advance his release date only by a few months, will protect his health, and will ease the burden on a prison system that is not equipped to cope with the pandemic.  Third, the limitations of the prison setting means that infectious diseases spread easily and there are few effective measures available to protect inmates generally, and vulnerable inmates, in particular.  Finally, as someone so close to release, Mr. Coston has an

established release plan.  Once released, he will rejoin his young family in New Haven, Connecticut, where they have a stable residence.

## PROCEDURAL HISTORY

On January 11, 2016, Antrum Coston was arrested on state charges by members of the New Haven Police Department.  He was released on bond, where he remained without incident for six months, until he was rearrested on the adopted federal charges, on or about July 13, 2016.  On July 13, 2016, Mr. Coston was presented before the Honorable Magistrate Judge Joan G. Margolis, and detained pursuant to the government's motion.  On August 3, 2016, Magistrate Judge Margolis, upon hearing Mr. Coston's application for bond, which included four signatures of a non-surety bond, granted his request for release.  Among other conditions of release, the Defendant's bond included that he reside in the third party custody of his adoptive mother, Pastor Eunice Tucker.

While on pretrial release, Mr. Coston generally abided by the release conditions.  Mr. Coston tested positive for marijuana on January 9, 2017.  He was previously certified by Connecticut State to use marijuana to treat his history of anxiety disorder and depression disorder.  He found employment and received a certificate of completion from the New England Tractor Trailer Training School (NETTTS).  On January 18, 2017, the Court granted Mr. Coston's request to modify the conditions of his release by removing the home detention with electronic monitoring condition and further allowing Mr. Coston to travel throughout the Northeast for work purposes.  On May 18, 2017, Mr. Coston appeared before this Court and pleaded guilty to counts one and three of a Superseding Indictment charging him with possession with unlawful possession of a firearm by a felon and possession with intent to distribute cocaine and cocaine base, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), respectively.  This Court continued his release conditions based on his unopposed request.

2

Subsequent to Mr. Coston's guilty plea, this Court granted requests to postpone the sentencing hearing, allowing Mr. Coston to further (1) work toward his sentencing hearing; (2) continue his success on release, and, (3) show this Court why its faith in Mr. Coston's release pending sentence was well placed.  On December 13, 2017, the Court imposed a sentence of 40 months on counts one and three, to run concurrently, followed by a three-year term of supervised release, on both counts, to run concurrently.  Mr. Coston was allowed to self-surrender on February 15, 2018, which he did to Schuylkill FCI.

Mr. Coston did—on information and belief—file a request with the warden at FCI Danbury on April 3, 2020, and to date, has not received a response.

## LEGAL DISCUSSION

I.    The Court may reduce Mr. Coston's sentence pursuant to the First Step Act if extraordinary and compelling reasons warrant reduction.

Under the First Step Act of 2018, federal prisoners may now petition courts directly for reduction of their sentences, and judges may grant such requests if "extraordinary and compelling reasons" support reduction.  *See* First Step Act of 2018, Section 603(b), Pub. L. 115- 391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)).  Previously, courts could modify sentences under § 3582(c)(1)(A)(i) only upon motion of the BOP Director.  Since the First Step Act was enacted, courts have granted relief under § 3582(c)(1)(A)(i) in numerous cases.  Here, the Court has the authority to modify Mr. Coston's sentence because "extraordinary and compelling" circumstances are present.

A.      The history of 18 U.S.C. § 3582(c)(1)(A)(i) explains the underpinnings of the authority currently delegated to courts.

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984.  Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).  In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court.  Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. *Id.*

Although BOP was first authorized to file compassionate-release motions in 1984, BOP almost never did so.  Order, *United States v. Rodriguez,* No. 2:03-cr-00271-AB-1, Doc. # 135 (E.D.P.A. April 1, 2020) (attached as Exhibit B).  From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions.  *Id.* (*citing Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)).  BOP's failure was multifaceted; according to a 2013 report by the Inspector General, BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates  . . . not being considered for release, and terminally ill inmates dying before their requests were decided."  *Id.*  The same report found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release."  *Id.*

It was in order to make compassionate release available that Congress intervened in the compassionate release process by passing the First Step Act, a landmark piece of criminal-justice

4

reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Id.* (*citing Brown*, 411 F. Supp.3d at 448 (*citing* Cong. Research Serv., R45558, First Step Act of 2018:  An Overview 1 (2019)).  The First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.  Congress made this change in § 603(b) of the First Step Act, titled "Increasing the Use and Transparency of Compassionate Release."  Section 603(b) was initially a standalone bill that "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.'"  *Id.* (*citing Brown*, 411 F. Supp.3d at 451 (*quoting* Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018))).  With the First Step Act, Congress intended to expand the use of compassionate release and labeled the changes to § 3582(c)(1)(A), "Increasing the Use and Transparency of Compassionate Release."[1]  There is no indication that Congress has ever intended to limit sentence modification to cases involving elderly prisoners or those with medical needs.  Indeed, the only limitation that Congress has placed on a court's discretionary sentence modification authority is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t).

Although Congress has never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c), the legislative history to the statute gives an indication of how Congress thought the statute should be employed.  When first discussing the

---

[1] 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018).  Senator Cardin observed that the First Step Act "expands compassionate release" and "expedites compassionate release applications."  164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018); *see also Hopwood, supra* note 2, at 106-07 (discussing legislative history of First Step Act).

purposes of the statute in 1983, the Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added). Congress intended that the circumstances listed in § 3582(c) would act as "safety valves for modification of sentences," *Id.* at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system. This safety valve statute would "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly *compelling situations.*" *Id.* (emphasis added).

With the 1984 legislation, Congress directed the Sentencing Commission to promulgate general policy statements regarding the sentencing modification provisions set forth in § 3582(c). *See* 28 U.S.C. § 994(a)(2)(C), (t). Although the Sentencing Commission took decades to do so (waiting from 1984 until 2007), it eventually promulgated 1§ B1.13 to provide guidance in compassionate release cases. The latest version of the Commission's policy statement, adopted in 2016, was intended to broaden eligibility criteria and encourage the BOP Director to file motions when extraordinary and compelling circumstances are present. *See* U.S.S.G. § 1B1.13 & Amendment 799.

The Commission's policy statement provides that a sentence reduction for "extraordinary and compelling reasons" must be accompanied by a finding by the court that the person is "not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Reasons supporting a reduction may include the defendant's medical condition, age, or family circumstances, but also "other reasons" that are "extraordinary and compelling." U.S.S.G. § 1B1.13, cmt 1. This final "other reasons" category specifically includes "an extraordinary and compelling reason other than, or in combination with," the other three circumstances listed (i.e., medical condition, age, or family circumstances). The policy does not prohibit consideration of a prisoner's rehabilitation, but provides that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, cmt. 3. In addition, the policy clarifies that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment," and thus, "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement." *Id.*, cmt. 2. Finally, the policy encourages the BOP Director to file motions when extraordinary and compelling circumstances are present and recognizes that the "court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community." *Id.* cmt. 4.

Although the Commission's policy statement provides that a BOP motion is required for sentence modification, courts have found this provision *inoperable* given that the First Step Act

eliminated the requirement of a BOP motion.[2]  *See, e.g.*, *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect."); *accord United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *2 (D. Utah Feb. 18, 2020) (collecting cases).  Indeed, because the Commission has not amended the 2016 policy statement since Congress passed the First Step Act in 2018, "[t]here is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act." *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *13 (M.D.N.C. June 28, 2019).  Thus, "[w]hile the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." *Id.*; *see also United States v. Bradshaw*, No. 1:15-CR-422, 2019 WL 7605447, at *3 (M.D.N.C. Sept. 12, 2019) (noting that "there is no policy statement applicable to a defendant's motion for compassionate release which constrains the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)," but observing that the "old policy statement does provide some assistance"); *United States v.Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence- modification provisions under § 3582.") (emphasis in original).  Similarly, in *Redd*, the

---

[2] Some courts have referred to this as a "lack" of an applicable policy statement.

court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants." 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020). Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *Id.* Courts must therefore independently determine whether extraordinary and compelling reasons warrant sentence reduction.

The government conceded this point in *United States v. Young*, agreeing that, "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." No. 2:00-CR-00002-1, 2020 WL 1047815, at *2 (M.D. Tenn. Mar. 4, 2020). Moreover, the Court, in *Young*, followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.* at *6.[3]

---

[3] *See also United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *2-3 ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law") (citing ten other cases); *Brown*, 411 F. Supp.3d at 451 ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." (internal citation omitted)).

9

B.    <u>The Court may reduce Mr. Coston's term of imprisonment based on its own determination of extraordinary and compelling reasons.</u>

The First Step Act grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A)(i).  The statute provides:

(1) in any case--

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

> (i)   extraordinary and compelling reasons warrant such a reduction;…

> *****

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).  Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

When Congress first created compassionate release in 1984, Congress also delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied, and a list of specific

10

examples." 28 U.S.C. § 994(t).  The Guidelines issued in exercise of that authority, U.S.S.G. § 1B1.13,

provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)   (A)   extraordinary and compelling reasons warrant the reduction; or
>
>       (B)   the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2)   the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3)   the reduction is consistent with this policy statement.

The Guideline provides examples of "extraordinary and compelling reasons" only in the application notes.  The examples generally fall into four categories based on a defendant's (1) terminal illness; (2) debilitating physical or mental health condition; (3) advanced age and deteriorating health in combination with the amount of time served; or, (4) compelling family circumstances.  U.S.S.G. § 1B1.13 comment. n.1(A)-(C).

The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons.  U.S.S.G. § 1B1.13, comment. n. 1(D).

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons."  Recently in this District, *United States*

*v. Colvin*, No. 3:19-CR-179 (JBA), 2020 WL 1613943, *2 (D. Conn. Apr. 2, 2020) (Arterton, J.)

("[I]f Defendant contracts COVID-19 before her appeals are exhausted, the undue delay might cause

her to endure precisely the 'catastrophic health consequences' she now seeks to avoid. *See* CDC

Guidance. . . . Third, Defendant would be subjected to undue prejudice—the heightened risk of severe

illness—while attempting to exhaust her appeals.  Thus, in light of the urgency of Defendant's

request . . . and the potential for serious health consequences, the Court waives the exhaustion

requirement of Section 3582(c)(1)(A).")   Other courts have held similarly.  *See United States v.*

*Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, *2-*3 (S.D.N.Y. Apr. 3, 2020) (Torres, J.)

("[T]he Court holds that Zukerman's exhaustion of the administrative process can be waived in light

of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic. . . .

[R]equiring him to exhaust administrative remedies, given his unique circumstances and the exigency

of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full

BOP administrative process both futile and inadequate." *See also United States v. Perez*, F. Supp. 3d,

2020 WL 1546422, *3 (S.D.N.Y. Apr. 1, 2020) (Torres, J.) ("Here, even a few weeks' delay carries

the risk of catastrophic health consequences for Perez.  The Court concludes that requiring him to

exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly

advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP

administrative process both futile and inadequate."

   Moreover, the reasons that can justify resentencing need not involve only terminal illness,

disability, or urgent dependent care for minor children.  Instead, courts around the country are finding

that "extraordinary and compelling" reasons include the impact of the global pandemic on vulnerable

defendants.

    1.    *Courts found extraordinary and compelling reasons warranting relief prior to COVID-19.*

Since the First Step Act was enacted in December 2018, and prior to the COVID-19 pandemic, courts have concluded that "extraordinary and compelling reasons" warranted relief in numerous cases under § 3582(c)(1)(A)(i).  As of February 24, 2020, the Bureau of Prisons reported 144 cases where sentences have been reduced under this provision.  *See* Federal Bureau of Prisons, First Step Act, https://www.bop.gov/inmates/fsa/.

Written opinions available on Westlaw show that courts are granting relief on a variety of grounds.  Some cases have focused particularly on the medical condition of the petitioner.  *See*, *e.g.*, *United States v. Larry*, No. 1:16-cr-0069 LJO, 2019 WL 4834850 (E.D. Cal., Oct. 1, 2019) (finding "extraordinary and compelling reasons" warranting relief under the First Step Act because the petitioner is "suffering from serious chronic medical conditions" which have "diminish[ed] his ability to provide self-care within the environment of a correctional facility" and because the petitioner "is not a danger to the safety of any other person or to the community"); *United States v. Bradshaw*, No. 2:05-cr-17-01, 2019 WL 7605447 (M.D.N.C., May 15, 2019) (finding the petitioner's diagnosis of "stage IV metastatic prostate cancer that ha[s] spread to his bones" qualifies as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act, noting that petitioner "has served approximately 37 months of his 72-month sentence" and because "[t]here is nothing in the record to indicate that he has had any disciplinary violations or infractions while in BoP's custody"); *United States v. Gasich*, No. 2:14-cr-63, 2019 WL 4261614 (N.D. Ind., Sept. 9, 2019) (finding the petitioner's diagnosis of "Stage 4 metastatic breast cancer" qualifies as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act); *United States v. Maria Del Carmen Romero*, No. EP-13-CR-01649-4-FM, 2020 WL 364275, at *3 (W.D. Tex. Jan. 21, 2020) (denying government's

motion to reconsider court's grant of relief, noting that "Romero suffers from a serious condition that qualifies as an extraordinary and compelling reason to warrant compassionate release"); *United States v. Ebbers*, No. S402CR11443VEC, 2020 WL 91399, at *8 (S.D.N.Y. Jan. 8, 2020) (concluding that a rapid medical decline, coupled with prisoner's age, present extraordinary and compelling reasons for release); *United States v. Schmitt*, No. CR12- 4076-LTS, 2020 WL 96904, at *4 (N.D. Iowa. Jan. 8, 2020) (granting relief to a prisoner "suffering from a terminal illness, stage four metastatic breast cancer that is spreading to other parts of her body"); *United States v. York*, No. 3:11-CR-76, 2019 WL 3241166, at *6 (E.D. Tenn. July 18, 2019) (concluding that prisoner's "combination of medical conditions, but particularly his heart condition, to be extraordinary or compelling reasons justifying a sentence reduction"); *United States v. Bellamy*, No. CV151658JRTLIB, 2019 WL 3340699, at *1 (D. Minn. July 25, 2019) ("The Court will find that extraordinary and compelling circumstances warrant compassionate release in Bellamy's case due to his serious and worsening health problems."); *United States v. Karr*, No. 6:17-CR-25-REW, 2020 WL 774363, at *9 (E.D. Ky. Feb. 18, 2020) (granting relief based on medical condition and rehabilitation); *United States v. Wong Chi Fai*, No. 93-CR-1340 (RJD), 2019 WL 3428504, at *3 (E.D.N.Y. July 30, 2019) (granting relief to defendant sentenced to life who had "experienced a 'serious deterioration' in his physical health"); *United States v. Spears*, No. 3:98-CR-0208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019) (granting relief based on age and medical conditions).   Some cases have stressed the BOP's failure to provide adequate medical care in concluding that extraordinary and compelling circumstances warrant relief. *See*, *e.g.*, *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *13 (M.D.N.C. June 28, 2019) (concluding that "[i]nvasive cancer and the abysmal health care provided by BoP qualify as extraordinary and compelling reasons warranting a reduction in her sentence to time served").

In granting relief, courts have also considered changes in sentence policy since the defendant was originally sentenced. *See*, *e.g.*, *Maumau*, 2020 WL 806121, at *7 ("Based on the above, the court concludes that a combination of factors—Mr. Maumau's young age at the time of the sentence, the incredible length of the mandatory sentence imposed, and the fact that, if sentenced today, he would not be subject to such a long term of imprisonment—establish an extraordinary and compelling reason to reduce Mr. Maumau's sentence."); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019) (reducing sentence where the petitioner "poses no current danger" and reduction "is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed"); *Cantu-Rivera*, 2019 WL 2578272, at *4 (granting relief to petitioner serving life sentence based on "fundamental change to sentencing policy carried out in the First Step Act's elimination of life imprisonment as a mandatory sentence solely by reason of a defendant's prior convictions" in combination with other factors including the petitioner's "extraordinary degree of rehabilitation, age, and medical condition").

In addition, courts have considered a combination of factors including rehabilitation, acceptance of responsibility, and the petitioner's ability to care for his family and help society outside of prison. *See*, *e.g.*, *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752 (N.D. Ohio Oct. 17, 2019) (concluding that the petitioner's "history; the circumstances leading up to his crime; his acceptance of responsibility not just with regard to the conviction but as demonstrated through the meaningful use of his time in prison; the failing health of his mother; his extraordinary job opportunity and the good that would allow him to do for his family and his community; and, the minimum time left remaining on his sentence" qualify as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act); *United States v. Bucci*, No. 04-10194-WGY, 409 F. Supp.3d 1 (D.

15

Mass. Sept. 16, 2019) (concluding that the petitioner's "role as the only potential caregiver for his ailing mother" coupled with the existence of the petitioner's "rehabilitation through his substantial time in prison" which has included "devoting much of his time to care for terminally ill inmates" qualify as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act).

>    2.    *Courts have found extraordinary and compelling reasons warranting relief in the wake of the COVID-19 pandemic.*

Finally, since the COVID-19 pandemic, courts have extraordinary and compelling reasons warranting relief where a defendant presents evidence of a pre-existing condition making him more vulnerable to COVID-19 in combination with the increased risks of COVID-19 in prisons. *See*, *e.g.*, Order, *United States v. Perez*, No. 1:17-cr-513-AT, Doc. # 98 (S.D.N.Y. April 1, 2020) (attached to Reply at Exhibit C); Order, *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, Doc. # 135 (E.D.P.A. April 1, 2020); Amended Order, *United States v. Powell*, No. 1:94-cr-316-ESH, Doc. # 98 at *1 (D.D.C. Mar. 28, 2020) (granting motion for compassionate release for 55-year-old defendant with asthma and sleep apnea in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust administrative remedies); Order, *United States v. Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020); Order, *United States v. Copeland*, No. 2:05-cr-135-DCN, Doc. # 662 at 9 (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, including Mr. Coston's pre-existing medical conditions of chronic asthma, present an extraordinary and compelling basis for a sentence

reduction, regardless of whether BOP moves for compassionate release or whether the request falls within one of the existing categories in § 1B1.13 commentary.

II.   <u>Mr. Coston's vulnerability to COVID-19 is an extraordinary and compelling reason for a reduction in sentence to time served.</u>

As have courts within the Second Circuit and elsewhere, the Court should conclude that extraordinary and compelling circumstances exist to warrant a reduction under § 3582(c)(1)(A)(i) based on the COVID-19 pandemic and Mr. Coston particular vulnerability to the disease.[4]

———————————————

[4] *United States v. Edwards*, No. 6:17-cr-3-NKM, Dkt. No. 134 (W.D. Va. Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *United States v. Hernandez*, No. 18-cr-20474, Dkt. No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer & immunosuppression and just under 12 months left to serve on 39 month sentence); *United States v. Perez*, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Williams*, No. 3:04-cr-95-MCR-CJK, Dkt. No. 91 (Apr. 1, 2020) (compassionate release in light of severe risk posed to defendant by COVID-19); *United States v. Gonzalez*, 2020 WL 1536155 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant).

A.    <u>Mr. Coston's history of asthma significantly increases his risk of severe complications from the COVID-19 virus.</u>

Based on the Presentence Report in this case, Mr. Coston is 37 years old and was diagnosed with asthma in the sixth grade.  PSR at 2 and ¶ 49.  Medical records from the BOP have been requested.  Medical records from Yale New Haven Hospital document the fact that Mr. Coston has asthma and is prescribed three separate inhalers.  He has been considered a high risk of contracting Chronic Obstructive Pulmonary Disease (COPD), and suffered from pneumonia in the past.  Mr. Coston's health records repeatedly emphasize that he has been intubated twice in 2000 and 2004.  Exhibit C (sealed).  As noted above, the CDC has determined that individuals with underlying conditions such as asthma are at a significantly heightened risk for severe complications from the COVID-19 virus.  Exhibit A.  The CDC report published March 31, 2020, makes it clear that among the population aged 19-64, the presence of an underlying condition like asthma increases the risk of hospitalization by three-fold (from 6.2-6.7% to 18.1-19.9%) and the risk of admission the ICU by more than four-fold (from 1.8-2.0 to 8.5-9.4).  Exhibit A (table 2).

The risk to Mr. Coston is particularly acute because at least 28 inmates and 12 staff at FCI Danbury, where he is incarcerated, have been confirmed to have the infection.  Notably, the numbers of inmate infections increased from 9 on April 1st, to 15 on April 2, and 20 on April 3, 28 on April 8.  This figure very likely underrepresents the actual number of cases because of the BOP's limits with respect to testing and the rapid march of the virus.  *United States v. Rodriguez*, 2020 WL 1627331 at *9 (E.D. Pa. Apr. 1, 2020) ("The BOP's reported cases are rapidly growing and almost certainly underestimate the true number of infections.  For instance, as of March 29, the BOP only listed eight COVID-19 cases at FCI Oakdale, while the Washington Post reported thirty-one.  Testing is also scarce throughout the country.").  Given the presence of the disease within the facility, Mr. Coston is

at great risk of infection and adverse health consequences, and release under § 3582(c)(1)(A)(i) is appropriate.

      B.    <u>Prison settings are inherently inadequate to deal with pandemic situations and the BOP has little ability to protect its inmates.</u>

Experts and courts recognize that prison settings are among the worst environments for protecting individuals from highly infectious diseases.  Based on publicly reported information, it appears the BOP's plan to protect inmates is based on little more than locking down facilities.[5] Exhibit D.  This is in contrast to the social distancing strategy that is being implemented world-wide. Based on the inmate deaths in the BOP (now at least 8), and the quick spread of the disease within the federal system, the lockdown strategy has not proved effective.  As of the filing of this motion, 213 BOP inmates were confirmed positive for the disease, including 28 staff at FCI Danbury.  Again, this almost certainly underreports the presence of the disease.  *Rodriguez*, 2020 WL 1627331 at \*9. The spread of the disease in the prison setting is not surprising.  *See, e.g.* ("These facilities contain high concentrations of people in close proximity and are breeding grounds for the uncontrolled transmission of SARS-CoV-2, the virus that causes COVID-19.  The conditions in federal prisons and immigration detention centers present significant health risks to the people housed in them, the correctional officers, health care professionals, and others who work in them, and to the community as a whole.").  Dr. Jaimie Meyer—a professor at Yale School of Medicine who has "worked for over a decade on infectious diseases in the context of jails and prisons"—explains some of the reasons for the heightened risk of disease spread in prisons.[6] Exhibit E.  Dr. Meyer explains:

---

[5] https://www.bop.gov/coronavirus/

[6] Thus far, a number of courts have relied on Dr. Meyer's affidavit.  *See, e.g., Basank v. Decker*, 2020 WL 1481507 at 3 (SDNY March 26, 2020).

> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater.  When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing.  When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community.  Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets.  Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

Exhibit E.  Dr. Meyer also explains that there are fewer disease prevention opportunities in a prison setting:

> During an infectious disease outbreak, people can protect themselves by washing hands.  Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings.  High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

Exhibit E.  Dr. Meyer also notes that segregation and isolation of inmates is not an effective strategy for perverting disease spread:

> Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death.  Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility.  Risk of exposure is thus increased to other people in prison and staff.

Exhibit E.  Courts considering claims similar to Mr. Coston have echoed Dr. Meyer's conclusion.  On April 1, the court in *Rodriguez*, noted that the presence of the disease within facilities meant that

"[t]he BOP's containment measures have already proven insufficient to prevent the spread of COVID-19."  2020 WL 1627331 at *9.  The Court explained that the BOP cannot protect at-risk given the realities of prison life.

> Many of the recommended measures to prevent infection are impossible or unfeasible in prison.  The government's assurances that the BOP's "extraordinary actions" can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease at the facility where Mr. Rodriguez is housed.  Indeed, Congress and the Department of Justice are increasingly recognizing the danger of COVID-19 outbreaks in prison and encouraging steps to release some inmates.
>
> Prisons are ill-equipped to prevent the spread of COVID-19.  Public health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer.   Joseph J. Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health, has studied infectious diseases in detention settings and states:
>
> Detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care.  People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19.  Toilets, sinks, and showers are shared, without disinfection between use.  Food preparation and food service is communal, with little opportunity for surface disinfection.   The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate transmission.

*Id*. at *8–9 (citations omitted).  Beyond Mr. Coston's own health, it is important to note that removing Mr. Coston from the prison population will both incrementally ease the crowding in the facility and will remove him as a likely burden on the facility's limited medical resources.  In light of this, protecting Mr. Coston against what is the inevitable spread of the disease provides an extraordinary and compelling reason to reduce his sentence.

21

C.      Mr. Coston is due to be released to a halfway house and home detention within months.

Mr. Coston' case is also exceptional and compelling because he has served nearly his entire sentence. The BOP projects Mr. Coston release date as November 22, 2020, meaning he is within seven months of the BOP release date. Said differently, Mr. Coston is seven months away from serving his full term BOP release date. Further, Mr. Coston is presently scheduled to move to (or be eligible to move to) a halfway house on May 21, 2020. Finally, he is eligible for home detention under BOP rules as of July 21, 2020. In these circumstances, the benefits of further incarceration are negligible compared to the danger faced by Mr. Coston.

Although Mr. Coston may soon move to a halfway house, he respectfully urges the Court to address his motion as soon as possible for several reasons. First, there is no guarantee that he will, in fact, be moved to a halfway house given the fast developing nature of the pandemic. Second, while a halfway house may be incrementally safer than a prison, it is still collection of individuals living in close proximity to one another. And, it is a population were individuals come and go, thereby exposing all present to new sources of infection. By contrast, releasing Mr. Coston to his home, even if on home detention, is a far safer option.

D.      The § 3553(a) factors favor release.

The factors discussed above also make it clear that release is appropriate from a § 3553(a) perspective. While this is Mr. Coston's second federal case, he was young when his trouble in the federal system began. As counsel noted in the proceedings last year, Mr. Coston has grown tremendously in the intervening years, and is a fundamentally different person. *See* Dkt. 83. From childhood abandonment, DCF involvement, to behavioral health issues, he showed the Court he is more mature, stable, and even employable. As he has in the past, he is ready to show this Court that with supervision under strict conditions – he can, and will, achieve success.

While the offenses of conviction are serious, it is not an offense involving violence.  Further, Mr. Coston has served nearly his entire sentence.  He is due to be released to a halfway house on May 21, is eligible for home detention starting on July 21, 2020, and his sentence is projected to expire on November 22, 2020.  In short, there is little left in terms of general or specific deterrence that would be accomplished by keeping him in custody at this point.  This is especially true in light of the risk posed to the prison population by COVID-19 and the heightened risk posed to Mr. Coston by the virus.

<u>**CONCLUSION**</u>

Antrum Coston respectfully requests that the Court grant his motion for compassionate release and impose a sentence of time served so that he can be immediately released to begin serving his term of supervised release.  In the alternative, Mr. Coston requests that the Court impose a sentence of time served and include a period of home detention (not to exceed 8 months) as a special condition of supervised release.

Respectfully submitted,

THE DEFENDANT,
Antrum Coston

FEDERAL DEFENDER OFFICE


Dated: April 9, 2020                     /s/ Tracy Hayes_____
                                         Tracy Hayes
                                         Assistant Federal Defender
                                         265 Church Street, Suite 702
                                         New Haven, CT 06510
                                         Phone: (203) 498-4200
                                         Bar No.: phv06527
                                         Email: tracy_hayes@fd.org

## CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that on April 9, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

       /s/ Tracy Hayes___
       Tracy Hayes